Case number 16-6387, EEOC v. AutoZone Inc, et al. Oral argument, 15 minutes per side. Mr. Kovnats for the appellate. You may proceed. Good morning, Your Honors. May it please the Court, my name is Philip Kovnatt with the appellate at the EEOC. I'd like to reserve five minutes for rebuttal. Thank you. The principal issue on appeal is whether the District Court erred in concluding that Bryce Townsville, the AutoZone store manager and alleged harasser in this case, was not a supervisor under Title VII and the Supreme Court's decision in Vance v. Ball State University. That decision was incorrect for the principal reason that AutoZone conferred upon Townsville the ability to make hiring decisions on behalf of the company. He could hire hourly store employees at the store in question, and the victims of his harassment were hourly store employees. The purpose of the Vance decision was to create a sharp dividing line between coworkers on the one hand and supervisors on the other, and the defining characteristic of a supervisor after Vance is the ability to take tangible employment actions. And I'm hard-pressed to find anything he could do with respect to their employment other than make a recommendation up the ladder. So what else could he do? He couldn't fire them. Apparently there's somebody else who's involved in arranging the schedules for the store. I mean, what's going on? Well, the second factual premise I disagree with, Mr. Townsville was primarily responsible for setting the schedules. But more to the point, to your question, the most realistic, most pressing concern is that Townsville was empowered to evaluate these employees, and there's evidence in the record that those evaluations translated into pay increases, which had economic consequences for these women, which added to the level of the threatening character of his harassment under Vance. Where do we find the exact evidence of the ability to evaluate? Because I don't think the district court mentions it. Right. The district court does not mention it. On page ID 636 of the record, it's clear that Townsville evaluated McEwen, and he was listed as supervisor on that form. And there's testimony from both Willett and Smith that they received pay increases in conjunction with each evaluation. And so that is – obviously, it wasn't a direct – he didn't have the direct authority to give them raises, but AutoZone relied on his evaluations to give pay increases. And Justice Alito's opinion makes clear that to be a supervisor, one need not have final decision-making authority. If the recommendations – What is that particular document you referred to as part of the record? There's a document which is an evaluation of Robin McEwen that was created by Bryce Townsville. That's at page ID 636 of the record. So you have a piece of paper showing him signing as evaluator for one employee, right? And his testimony that he could evaluate employees and discipline employees, and there's testimony from Smith and Willett that those evaluations led to pay increases. So from that, a jury could find that he had the sufficient authority to be a supervisor under Vance, and that's separate and independent. I thought he could recommend discipline, but I didn't think he could impose discipline. He could write someone up, which then would be transferred. Which was a recommendation. Correct. But there's another important fact that Justice Alito talked about in the second part of his majority opinion, that if a enterprise is set up in such a way that there is – if an employer confines final decision-making authority to off-site managers, then the person who has the daily interaction and the most firsthand experience and on whose recommendation the company will necessarily have to rely, in that circumstance, the company should be deemed to have effectively delegated supervisory status to the person on whose recommendation it relies. And that is precisely – I don't think that it happened here. I'm sorry? The district court did not think that it happened here, correct? Well, the district court found that the store – that the district manager was not obligated to follow the store manager's recommendation. And of course, there's nothing that formally required the district manager to follow the store manager's recommendation. But the question is a practical one. And if you look at the structure of the enterprise, there's no way the district manager, who had little if any interaction with the store employees, could take a tangible employment action against those employees without getting the input from Bryce Townsend, who was the manager on duty. I think another way of thinking about this is, if the district court's decision is correct, that would mean there is no supervisor on duty at AutoZone stores within this district and probably nationwide. And that is precisely the scenario that Justice Alito was trying to address in the latter part of his majority opinion when saying that if a company confines final decision-making authority to off-site managers, then it cannot avoid vicarious liability for the harassment of its on-site managers on whose recommendation it necessarily has to rely before taking tangible employment actions. And that is the precise situation we have in this case. If this case doesn't fall into that hypothetical that Justice Alito set forth, I don't know what case would. So Townsend had the ability to hire store employees. His victims were store employees. If, for example, one of them quit at some point during their tenure under Townsend and then sought to reapply, he would have been the one to make the hiring decision. He had hiring authority over his victims. He happened not to be present at the time that the hiring decision was made. But there's nothing in Vance that says vicarious liability should turn on just happenstance and timing. It's about the level of authority that the company empowers. What about the affirmative defense? I know that's not the ground for the decision, but it was argued there, was argued here. They have a policy. You had to click that you had gotten it, read it. Same with updates. I feel like that part looks pretty good. It seems like if there's a harder part for summary judgment purposes, it's the second part in terms of the promptness in implementing the policy. So what's your take there? Okay, so in the context of the affirmative defense, it's AutoZone's burden at summary judgment to show through undisputed evidence that it took reasonable steps to prevent. We got rid of all that stuff. Okay, so the evidence that undermines the notion that it took reasonable steps to prevent harassment is evidence that AutoZone managers were affirmatively encouraging employees to simply click acknowledge without making sure they even read the policies or understood them. There's testimony that the claimants here did not receive handbooks. There's no evidence about the level of training anyone got. If you look at the conduct of the actors in this case, it is plain that they didn't know how to respond to harassment. For example, Smith goes to her coworker, Chad Berry, and says, he grabbed my crotch and said he wanted to have sex with me. What should I do? He said, I don't know. You shouldn't let a man touch you like that. Robin McEwen is upset about harassment that she's exposed to and that Smith is exposed to. She goes to her former boss, who doesn't even work there anymore, and says, how do I deal with an issue? She had worked there for two years. You might slow down a little bit. It would help me in terms of processing, and it might help you in terms of listening. What I was trying to say was it seemed to me they do a pretty good job on step one of the affirmative defense, because I'm a little skeptical of the idea that the company has to make sure someone reads it and understands it and can remember it two years later. I feel like what they're doing honors the concept of the affirmative defense. They have the policy. They make sure people acknowledge getting it. They know where it is. I feel like that's enough. If something happens, you should know to go to the computer and find out what's going on. So I'm highly skeptical of your position on step one. You chose to challenge me on that, which is fine. I'm more unsure about step two. That was my question. Step two is the question of how they implemented it in terms of timing. Maybe your answer is implicit. You think you're weaker on step two. No, no, no. I still have ample time to talk about it. The other argument is that there's evidence that they failed to correct the harassment once they were on notice of it going on. Okay. So there's evidence that in late September of 2012, Smith reported it to Chad Berry. It's too late. Are you now October? No, no. Late September of 2012, AutoZone was on notice as a matter of law under this court's decision in Clark v. UPS. There was an ensuing five- or six-week period. What happened in September again? Smith reported to Chad Berry that Townsville had grabbed her crotch and said he wanted to have sex with her. She asked him what she should do. He said, I don't know. He was obligated to take that up the chain and failed to do so. There was an ensuing five- or six-week period in which the harassment continued and escalated. And there's another important period in mid-October of 2012, which is when Smith went to Ira Graham, who was the district manager. He was Townsville's direct supervisor. He was plainly in a position to put a stop to the harassment. He was Townsville's direct supervisor. And he said to Smith, after she said that he had been sexually harassing her, we have to do something about that. So what does he do about it? He waits 10 days to two weeks. What do we do about her deposition where at one point she says it's October 31st? Another point she says a week or two earlier. But the only time she's specific is when she says October 31st. Everything else is highly vague. There's temporaneous evidence that she wrote a letter to Diener in early November when she said, I complained to Ira in the week between October 14th and 20th. It's true that her deposition she sort of induced by counsel. The question in the deposition was, and the first time you complained, I see my time is up. May I just finish the sentence? Yeah, quickly. She said that the lawyer asked her, the first time you complained to Ira Graham was October 31st. She said yes. But that is in contradiction to what she had said at the time in the contemporaneous letter to Diener. So considering the evidence in the light most favorable to the EEOC, we have to go by the timeline, which even the district court adopted, that the complaint happened in mid-October, not late October. And in any event, if I could just add one more point, what Graham did was to convey to Diener that Bryce is saying stuff in the store, which Diener testified she didn't even understand to me a complaint of sexual harassment. And the only reason Diener took any action is because Smith reached out to Diener directly, irrespective of the conversation with Graham. And that's when Diener actually took investigatory action and remedial action. It had nothing to do with the report to Ira Graham. Thank you, Your Honor. Good morning, Your Honors. Tracy Kern on behalf of the Appellee AutoZone. Just to follow up really quick on what was just said by counsel, Judge Sutton, you had expressed concern about the date in which Ms. Smith made the report, because her testimony in the deposition was October 31st, and that is true, and I'm the individual that actually elicited that testimony. But if you also look at the statement that Ms. Smith gave to Ms. Diener during the investigation, which was very close in time to the alleged harassment, and that is at the appendix 50-9, page ID 709. She was asked very specifically by Melody Diener, please tell me who you reported the comments in touching to and when. And her response was, quote, I reported the comments in touching to Ira on October 31st, 2017. So that was Ms. Smith's own testimony to Ms. Diener. Now, there are three grounds on which this court can affirm the summary judgment, and one would be the supervisor issue where Judge Mayes found that Mr. Townsall was not indeed a supervisor. Our other argument is that the alleged conduct did not rise to – that Townsall had hired Smith, just hypothetically. I know that's not what happened, and I know that's part of the lower court decision, but just hypothetically, he had hired Smith. Would this case – would we then be just in the other grounds, because we would say then Townsall was a supervisor vis-a-vis Smith? No, Your Honor, because the holding in Vance was very clear, and what the holding was was that an employee is a supervisor under Title VII only if he or she was empowered by the employer to take a tangible employment action against the victim. And so under your hypothetical, it would not change our analysis of the situation. But Vance also talks about hiring as one of the indicia of being a supervisor as opposed to a coworker. Correct, but in the analysis is you have to look at what employment actions can be taken vis-a-vis the alleged complaining party, and that is the purpose. You're saying, in my example, Townsall hired her. I mean, you know, I'm no expert on this, but I thought the whole thing about sexual harassment was power problems, and if you've hired somebody, you're bound to have some power over them, and that's the risk. It wouldn't change our analysis, Your Honor, unless he actually premised the hiring decision upon a sexual invitation or favor, and it could have been an unfulfilled threat. But the core holding of Vance, and I believe that you and Judge Gibbons have sat on the panel that decided Marengo, is that you look at the action that a supervisor can take against the victim. Mr. Townsall could not take a hiring action against Ms. Smith because she had already been hired. But even if he had hired her, it wouldn't change our analysis because at the time of the alleged harassment, he had no power to hire her. She had already been hired. Hiring power, hiring authority, it seems to me, is most relevant to the supervisor analysis when we have a failure to hire case, and it becomes less important when you're looking at things that occurred after the employee is already at work. Is there any case law that supports that? That seems common sense to me. Well, in common sense, I do agree. But if you look at the cases that have interpreted Vance or followed Vance, they always talk about employment actions that can be taken against the victim. And one of the examples that we used in our brief, because it would lead to absurd results if you read out the against the victim language, is a recruiter whose sole authority was to hire would then become a supervisor for an employee that worked, you know, in another state in another store if he came over and propositioned her. And that clearly cannot be the law. I mean, Vance was very specific in saying that it wanted to narrow the definition of supervisor. There was a split in the circuits. I guess my response to that hypothetical, the EEOC response to, I mean, hiring is an indicia. It's not the only indicia. I mean, they listed a bunch of things. That's one of them. So I think the recruiter doesn't become a supervisor just because they hire. You have to account for the whole thing. It's just hiring is one indicia. But, I mean, another way to look at it is the dichotomy is coworker versus supervisor. Correct. You never would think of a coworker as someone that has the power to either hire the person or has the power to hire, quote, a coworker. It's just weird. Doesn't that make sense? I mean, it just seems funny to me. How can you be a coworker if you have power to hire someone in that position? But just because you have the power to hire, let's say that's your sole power, that doesn't necessarily make you a supervisor. Well, that's not our situation. Of course it's not. And EEOC is not even disputing that Mr. Townsville did not hire the individuals. So that's not the situation here. Can you fast forward a little bit? Yes, absolutely. And talk about the things that your adversary has focused on as, I mean, power to evaluate, the things that he mentioned that may not have been either mentioned or emphasized in the district court opinion. Yes, Your Honor. And the record is very clear that the EEOC did not carry its burden in establishing that Mr. Townsville was a supervisor. If you look at the Appendix 50-17, ID 739, in the Statement of Unmaterial Facts, the EEOC, in fact, agreed that Mr. Townsville could not fire, he could not demote, and he couldn't transfer employees. He could not promote anybody. That was all the district manager's responsibilities. And unlike – What could he do? I mean, could he evaluate? He could evaluate. He could recommend discipline. He could recommend discipline. But the record evidence said that ultimately it was up to the district manager to make a decision as to where that discipline would go or would not go. To what extent is there evidence in the record about the extent to which his evaluations became the de facto company evaluations and that raises were based on those? No, Your Honor. In fact, the record is devoid even of a disciplinary record by Mr. Townsville. There is no evidence in the record that he ever disciplined any employee, much less the three individuals. The only thing in the record is a signed evaluate that he actually signed on Ms. McEwen. But there's no evidence to suggest that his evaluation of Ms. McEwen was going to result in some sort of tangible employment action. The evidence simply was not developed by the EEOC. And if you look at the record evidence, and again I point you to the Statement of Unmaterial Facts 11 and 12 that the EEOC marked as undisputed, it clearly shows he lacked that authority. At most, the authority that he had was to direct an employee's work assignments. And unlike, for example, in Farragher, Mr. Ira Graham, which was the district manager who was empowered to make decisions above Mr. Townsville, he was in the store at least once a week for a full day, and that is in the record. What's also in the record is that Ms. McEwen, one of the claimants here, would reach out to Mr. Ira Graham on a regular basis and complain about Mr. Townsville. Not that he was harassing her, but that Mr. Townsville was coming in late to work, that he was using his Bluetooth. So clearly, Mr. Townsville was not acting in this sort of situation where he is the ultimate decision-maker, say, under stop. Because Mr. Graham was very active in the store. He was there a lot. The employees reached out to him when they had issues. So under that circumstance, no. I mean, I think that this case really – What's your favorite theory of affirmance? I'm sorry? What's your favorite theory of affirmance? There are three options. What's the one you – Well, Your Honor, I think that they're all strong. I mean, obviously, I agree with Judge May's analysis of the supervisory issue. I believe that out-of-zone – That's number one? That's number one. My second, you have to rank them in order, because, again, I think they're all strong, is that even if this Court does find that Mr. Townsville was a supervisor, that out-of-zone met its affirmative defense. And if you look at the evidence there, if there's any question that out-of-zone had a policy, and I think, Judge Sutton, you were the one that commented on it, and I completely agree with you, and if you look at the Shaw v. out-of-zone decision, is that out-of-zone had a policy. It gave all of its employees the policy. Ms. Smith, who was a manager, testified, hey, I knew as a manager I was responsible for enforcing the policy. They acknowledged the policy on numerous occasions. All three claimants said that they had access to the policy at any time. Ms. McEwen actually said that she read the policy and went training. But the fact that Ms. Smith is now relying on, oh, I didn't really read it, even though they gave it to me, doesn't fly, and it doesn't fly under Shaw v. out-of-zone and other cases that we cited in our particular brief. So I think that we have carried the burden that we have a policy. It was an effective policy. It provided for several avenues of complaint. What about his point about the September contact, that Barry was told about this and not much happened for five, six weeks? What's your reaction to that? The EEOC admitted, and let me just get the statement for you. They admitted that out-of-zone had a problem-solving procedure which directed employees to follow a chain of command to alert folks in the know. Ms. Diener, the HR manager, expanded upon this and said employees were required to follow the problem-solving procedure. I just want to make sure we're on the same page. She says there's a pretty long delay in implementing the policy when it comes to this alleged harassment because she first talks to Barry in September, and nothing happens for a while. Okay. How do you respond? Several comments on that, Your Honor. First of all, under the problem-solving procedure, Mr. Barry is not the appropriate person in the chain of command. Mr. Barry was, in fact, Ms. Smith's subordinate. He wasn't even her manager. Her answer is she's not invoking the procedure. She was not invoking the procedure, A. B, she also testified, and the EEOC admitted to this fact, is that she knew that she was required to report harassment immediately, and she failed to do so. And that admission alone, I think, is sufficient. And Mr. Barry was not at the same store. Mr. Barry wasn't even in the same district or the same region. Mr. Barry was miles and miles away at a different store, and he wasn't even her subordinate because they weren't even in the chain of command, but in the autism hierarchy, he would have been considered her subordinate. And that clearly is not sufficient to he had no authority to correct any type of sexual harassment that may, in fact, have been going on, and that's why. Well, it's not sufficient to trigger the duty to do something about it, I take, is your argument. That is my argument as well. First of all, it doesn't fall within the problem-solving procedure. And second of all, Mr. Barry also testified, I didn't even take it as a complaint of sexual harassment because she didn't seem serious. Sometimes it might take a plaintiff a while to get the courage to pipe up about some sordid experience. Does that eliminate the chance to bring a claim? What's very interesting with that, Judge Cook, is Ms. Smith actually in October, and this is undisputed, in the height of the harassment, Mr. Graham was going to transfer her to a different store because there was a store down the road that was shorthanded and she was an experienced manager. Undisputed in the record that Ms. Smith, again, this is in October, called Mr. Townsell and said, I don't want to be transferred. Mr. Graham is trying to transfer me. I don't want to go. So I think that's very significant in showing, was she really being harassed, A, but B, that Mr. Barry didn't even consider it to be a complaint of harassment. And again, the problem-solving procedure is there for a reason. It's so that people who can do something to stop the harassment are those that are to be notified. Let's say you've answered the Barry point, and let's say if you're right about October 31, it looks pretty good from the company's perspective because things move along pretty quickly. Let's say for the sake of argument, we decide to, given the standard of review, focus on more mid-October is when she communicated to Graham the problem. How would the case look if that's the way we look at the facts? And that is actually the way that Judge Mays examined the facts, was that there was a complaint to Mr. Graham in mid-October, yes. And Judge Mays actually found that AutoZone still met its burden because the- Okay, maybe I forgot something. I had in my head that he relied just on the supervisor theory. Did he rely on the affirmative defense as well? Forgive me if I forgot that. No, no, no, he did not. But in analyzing co-worker harassment, he did say that the investigation was still prompt. Okay, so just what's the company's answer if we accept mid-October is the time in which Smith notifies Graham? How does the case look from that? Okay, it's undisputed that- and, again, this is the material issues of fact that the EEOC did not dispute- was that Mr. Graham immediately informed Ms. Diener that something was going on in the store. But I thought he doesn't communicate to Diener until November. Am I wrong about that? The statement of unmaterial facts that the EEOC agreed to says very much otherwise. We're trying to back off of that now saying, see, we really didn't mean to agree to that. But that is exactly what-and I don't have the number in front of me, and I apologize. But even so, when Ms. Diener communicates with Ms. Smith- and I think that we can all agree that with regard to Ms. McEwen and Ms. Ouellette, they did not utilize the policy at all. They didn't complain until, in fact, they were confronted. So in dealing with Ms. Smith, she had a conversation with Ms. Diener within about 10 to 12 days of her alleged conversation with Mr. Graham, if we're going to go with the mid-October date. The basis of her complaint there was, I don't like my schedule. It was completely an operational issue. And Ms. Diener was sort of confused because Graham had come to her and said, you know, there's an issue in the store, I'm not really sure what it is. And so she thought it was an operational issue and asked Ms. Smith, and this is all undisputed, to go ahead and send in a letter so she could kind of clarify what she meant by her schedule. Three pages later, there was faxed to Ms. Diener on November 5th. Two and a half pages of that was, I don't like my schedule, I don't work on Sundays, I don't have child care arrangements, blah, blah, blah, blah. And at the very end, oh, by the way, I'm being sexually harassed. And then the very next day, Ms. Diener was in the store. She interviewed Ms. Smith, she interviewed Ms. McEwen, she interviewed Ms. Ouellette, she interviewed Mr. Townsell, and she interviewed Mr. Akins. All that next day. Ms. Smith never had to work with Mr. Townsell again. Mr. Townsell was transferred from the store on November 18th and was subsequently fired after that. So, again, once the complaint was made, very, very quick action by Ms. Diener to end the harassment, and Ms. Smith testified herself she was satisfied with the promptness of the investigation. Any other questions, Your Honor? Thank you, Your Honor. I'd just like to address the timeline that Ms. Kern was just talking about. The key fact that she left out is that what Ira Graham communicated to Melody Diener was completely ineffective. He went to her, even assuming that when he went to What are you talking about? In early November of 2012, Graham goes to Diener and says, Bryce is saying stuff in the store. Diener asks him to clarify, what do you mean, what stuff? And he says, I don't know, which was false given that Smith had told Graham that Bryce was sexually harassing her. Diener testified that she didn't even interpret the conversation with Graham to mean a complaint of sexual harassment, and she testified that she had no intention of taking any action as a result of the conversation with Graham, and the only reason she took action is because Smith reached out to her irrespective of the conversation with Graham. But just to make sure I'm grasping the point you're making, that all happens within, like, 48 hours. That's all really fast. That's the early November. That's when I thought the company looks good. What am I missing? No, no. I think, considering the facts in the light most favorable to the EEOC, this happens in mid-October. Graham fails to do anything for 10 days to 14 days. There are acts of harassment in that ensuing period. And AutoZone still has a problem with its affirmative. It started by focusing on the Graham-Diener conversation, which I thought even you agreed happened in early November, right? That's correct. Okay. So who cares about the lack of his telling everything when Diener responds perhaps more aggressively than she needed to? But she didn't respond. She only responded after Smith called her, and it had nothing to do with the conversation with Graham. But I guess I'm just like, why do I care if it happens so fast? Because Graham found out in mid-October there were instances of harassment in the period of time. That seems like the point. Right. I get that. That one I understand. I don't understand the focus on early November because I think the company looks pretty good. You think the company fails to establish the affirmative defense because there was a two-week delay if there was one? I mean, there were acts of harassment in that two-week period which precludes summary judgment on the affirmative defense. There's ample case law. We're applying a standard of really, we're looking at the reasonableness of the conduct. We're not looking at whether it's not a strict liability thing. I mean, there's a reasonableness standard here. Right, and it's unreasonable for the district manager to sit on that type of information for ten days and two weeks and then go to the human resources official and mislead her by saying, I don't know what's going on, when in fact he does know what's going on. That is unreasonable. Give us a case or two that's the best case that would say that two-week gap, constrain the facts your way, really does look unreasonable. What would be the case that we should read to figure that out? Well, I think this Court's decision in Clark v. UPS gives, it says that if there is a question about the reaction of mid-level supervisors, which Graham clearly was, then that at least creates a jury question about whether the company met its affirmative defense. And is that a two-week type delay thing? I don't know what the exact temporal notion is in that case. I mean, I think that the point is that even if Graham had acted the next day, what he did was unreasonable because he lied to Diener. Is it a lie for him to say, I don't know what's going on? I mean, a manager who accepts the word of an employee without any further investigation is probably more unreasonable than the one who takes it to HR and says, I don't know what's going on, so that appropriate follow-up investigation. But this was reported to me. That wouldn't be necessarily a lie. In fact, that might well be prudent management action because he's not supposed to do the on-site investigation. He's supposed to take it to the HR person, which he did. I dispute that last factual premise. Graham was plainly in a position to do an on-site investigation. He was counsel's direct supervisor. He could have gone to counsel that very day instead of taking it to Diener. But I would also say that for him to get a report of sexual harassment and then to say, if that's happening, we've got to do something about it, and then sit on it for ten days to two weeks, and then go to the HR person and give her a misleading report that doesn't even communicate sexual harassment, that is unreasonable behavior. And if the burden is on AutoZone to show that it took reasonable steps to correct harassment, its evidence fails, and the district court was incorrect in granting summary judgment for that reason as well as for the reason that counsel was a supervisor under Vance. Anything further? We thank you both for your argument. We'll consider the case carefully. Thank you, Your Honor. The other cases are on the briefs. We can adjourn court.